## Ellis's Estate.

*Wills—Construction—Testamentary trusts—Perpetuities—Doctrine of cy pres—Act of April 26, 1855, and its amendments and supplements.*

Where a testator has bequeathed his residuary estate to trustees to establish and maintain a school for the purpose of educating and maintaining white fatherless girls between the ages of thirteen and seventeen, resident within a certain geographical area, and has further directed that all accumulations of income shall be used for the same purpose, the trust fund is within the purview of the Act of April 26, 1855, P. L. 328, and its amendments and supplements, and is subject to all the provisions of those acts, and if the number of white fatherless girls meeting the description and needing institutional care is so small that the income produced by the *corpus*, in excess of $50,000 a year net, cannot be used for the purpose with advantage to the community, all income in excess of that amount and all accumulated income will be applied under a *cy pres* plan to maintain white fatherless girls in their own homes.

GEST and VAN DUSEN, JJ., dissent.

Exceptions to adjudication. O. C. Phila. Co., Oct. T., 1910, No. 154.

The facts appear from the adjudication of

HENDERSON, J., Auditing Judge. — Our testator, Charles E. Ellis, died April 6, 1909; this is the second trustee's account of the fund held to secure the annuities to his widow and daughter of $15,000 and $6000 respectively, and to erect and maintain a college for a circumscribed group of white fatherless girls; upon the deaths of the widow and daughter, respectively, the *corpus* producing these annuities will merge into the fund for the college. From the accounts now before me it will be seen the *corpus* of this trust amounts to $3,922,388.19 and accumulated income of $2,040,143.05, calculated to Jan. 1, 1926.

With so great an accumulation of income in a trust for a charitable purpose, and the college now has but sixty little girls, I concluded that it was my duty to exercise the visitorial powers of the court. This function of the court is so well recognized that citation of authority seems superfluous—see Hamilton *v.* Mercer Home, 228 Pa. 410, 422; Toner's Estate, 260 Pa. 49, and Orphans' Court Act of 1917, sections 9 *(b)* and 9 *(a)*.

Accordingly, I appointed John S. Bradway, Esq., to vouch the account and aid me in the exercise of these powers. He made an extensive investigation of this college, its methods and administration and of the methods now pursued by charities of this kind, and presented a comprehensive report thereon. The trustee found itself unable to concur in the suggestions of the *amicus curiæ*, and, hence, I took considerable testimony to develop the facts relating to the college and the best method of caring for fatherless girls.

I regard this as one of the most important matters that has come before this court since I came upon the bench, and I have been unstinting in the time I have devoted to it. This testator has been dead for over sixteen years, the fund is now nearly $6,000,000, and yet there are about sixty fatherless girls in the institution and but twenty-three graduates. I invited numerous charitable organizations for child welfare to appear and give me the benefit of their experience in such work, and many of them had their attorneys enter an appearance for them.

The situation is complicated by the existence in this neighborhood of numerous institutions for largely the same purpose; some of them with huge endowments and few beneficiaries; for instance, Carson College, with $3,500,000 and about 107 white double orphan girls; Burd Asylum, with $750,000 and forty white orphan girls between four and eight years of age; and John

Edgar Thomson School, with about $2,000,000 and, until reorganized recently under permission of this court, but fifty orphan girls, the daughters of railroad men.

The petition of Constance Biddle, Karl de Schweinitz, Helen Foss Wood, Margaret C. Maule, Dr. Samuel McClintock Hamill, Edith Wharton Dallas, Walter I. Cooper, Angeline Low Forbes, J. Prentice Murphy, Albert P. Gerhard, Sara E. Laughlin, Edwin P. Solenberger, J. M. Willcox, Hon. George Woodward, T. Williams Roberts and Benjamin H. Ludow for leave to intervene, and praying that the income from so much of the *corpus* as exceeds that required to produce $50,000 a year shall be applied *cy pres,* and that the accumulation of income as shown by the supplemental account shall be awarded *cy pres* or held to await legislative action, filed with the assent of the Attorney-General of the Commonwealth, in accordance with section 10 of the Act of April 26, 1855, *supra,* was, after hearing, allowed by this court on June 7, 1926. Thereafter it was agreed that the testimony of record should be considered with the same force and effect as if this intervention had been allowed at the outset.

The trustee's petition for distribution prays that the accumulated income shall be added to the balance of the principal and this combined sum awarded to the accountant in trust for the purpose set forth in the will.

Two questions are thus presented for adjudication: (1) Shall the income of the *corpus* in excess of $50,000 a year be applied *cy pres;* and (2) what disposition shall be made of the accumulated income of over $2,000,000?

Such charitable trusts are regulated by sections 4, 8, 9, 10, 12 and 15 of the Act of April 26, 1855, P. L. 328, entitled "An act relating to corporations and to estates held for corporate, religious and charitable uses," and are as follows:

"Section 4. That it shall not be lawful for any unincorporated literary, religious or charitable society, church, association or congregation hereafter to acquire and hold, either in the associate name or that of trustees or otherwise, real or personal property that in the aggregate is of a greater yearly value than, if incorporated, it would be allowed to hold under the general laws of this Commonwealth for incorporating such associations; nor shall it be lawful for any corporation incorporated under any law of this State hereafter to acquire and hold through any trustee or trustees, or by any other device whatsoever, real or personal estate to a greater amount or value than such incorporation is by its charter allowed to hold: Provided, that any property now held as aforesaid in excess of such value shall not be hereby invalidated or prejudiced in title or otherwise.

"Section 8. That any literary, religious, charitable or beneficial society, congregation, association or corporation having capacity to take and hold real and personal estate within this Commonwealth may acquire and hold the same to the extent in the aggregate of the clear annual value of $5000, and to no greater extent without an express legislative sanction; and in ascertaining such value, all vacant lots or lands shall be taken to be of the annual value at which such lots or lands could be let upon ground rent or at the interest of the price at which they would sell for cash and without sacrifice; and if occupied and yielding rent or income, then as if the annual value of such rent or income, or of the valuation as vacant ground, in manner aforesaid, whichsoever shall be of the greater amount; but no edifice used for worship, education, or a hospital or the unproductive ground contained within the curtilege of such building, shall be included in such valuation: Provided, that no *bona fide* purchaser for a valuable consideration shall take a defeasible title by reason

of the grantors having held property in excess of the limit aforesaid: And provided, that any property now held as aforesaid, in excess of such value, shall not be hereby invalidated or prejudiced in title or otherwise.

"Section 9. That all property hereafter acquired and held by persons, corporations or associations, forbidden by this act to hold the same, or held contrary to the intent of this act, and all such hereafter acquired and held beyond the limit prescribed as aforesaid by this act, shall escheat to this Commonwealth, and upon the same being adjudged to have escheated under proceedings in court by *quo warranto* in all respects as is provided by law in the case of the usurpation of any corporate franchise, the same shall be taken in possession and disposed of, and with the like compensation to the person or persons informing and procuring the inquisition as in cases of property escheated for defect of heirs: Provided, that no property now held, or hereafter lawfully acquired, shall afterwards become defeasible in title by reason of any subsequent rise in the value thereof; but such rise, after it shall occur, shall be taken into view to preclude a further acquisition and holding beyond the limit aforesaid: And provided, that the legislature may relieve, upon such terms as may be deemed just and for the public good, from any forfeiture as aforesaid, upon the payment to the party informing or prosecuting, his actual expenses, and such further reasonable compensation as the legislature may prescribe.

"Section 10. That no disposition of property hereafter made for any religious, charitable, literary or scientific use shall fail for want of a trustee, or by reason of the objects being indefinite, uncertain or ceasing or depending upon the discretion of a last trustee, or being given in perpetuity or in excess of the annual value hereinbefore limited, but it shall be the duty of any Orphans' Court, or court having equity jurisdiction in the proper county, to supply a trustee, and by its decrees to carry into effect the intent of the donor or testator, so far as the same can be ascertained and carried into effect consistently with law or equity; for which purpose the proceeding shall be instituted by leave of the Attorney-General of the Commonwealth, on the relation of any institution, association or individual desirous of carrying such disposition into effect and willing to become responsible for the costs thereof, subject to an appeal as in other cases in said courts, respectively, and to be reviewed, reversed, affirmed or modified by the Supreme Court of this State; but if the objects of the trust be not ascertainable, or have ceased to exist, or such disposition be in excess of the annual value permitted by law, or in perpetuity, such disposition, so far as exceeding the power of the courts to determine the same by the rules of law or equity, shall be taken to have been made subject to be further regulated and disposed of by the Legislature of this Commonwealth, in manner as nearly in conformity with the intent of the donor or testator, and the rules of law against perpetuities, as practicable or otherwise, to accrue to the public treasury for the public use.

"Section 12. That to avert the evil of an indefinite increase of the property in mortmain and perpetuity, it shall not be lawful for any religious, charitable, literary or scientific society, association or corporation, present or future, to accumulate income into capital or invested estate, so as that the clear annual value thereof, as regards future acquisitions with those now held, shall exceed the limitation hereinbefore contained, and as regards acquisitions now held by or for any such body shall not exceed said annual amount, except as the property now held does or being made more productive may exceed such amount, but all such clear *(sic)* income, after such amount of capital or invested estate shall be attained, shall be expended annually in and for the

purposes, uses and trusts upon and for which the property producing it is held; and if there be not objects within the intent of such purposes, uses and trusts sufficient to exhaust such income, it shall be the duty of such body or association holding such property to apply to the legislature for authority to expend the income thereof upon such practicable objects as shall most nearly conform to the intent of the uses and trusts upon which such property is held, and in default thereof, such income as shall not be so expended in execution of its trust shall be paid into the treasury of the Commonwealth: Provided, that this section shall not be taken as intended to apply to any corporation or trust, if any there be, placed by contract beyond such legislative requisition.

"Section 15. That all dispositions of property hereafter made to religious, charitable, literary or scientific uses, and all incorporations or associations formed for such objects, shall be taken to have been made and formed under and in subordination to all the duties and requisitions of this act, as rules of property and laws for their government."

Also, the Act of April 22, 1889, P. L. 42, entitled "A supplement to 'An act relating to corporations and to estates held for corporate, religious and charitable uses,' approved April 26, 1855, increasing the limit of real and personal estates which may be held by such corporations," which act is as follows:

"Section 1. Be it enacted, &c., that any literary, religious, charitable or beneficial society, congregation or corporation having capacity to take and hold real and personal estate within this Commonwealth may acquire and hold the same to the extent in the aggregate of the clear yearly value of $30,000, and to no greater extent, without an express legislative sanction. Such value shall be ascertained as provided by the act to which this is a supplement."

Also, the Act of May 9, 1889, P. L. 173, entitled "Relating to estates held for religious and charitable uses," which is as follows:

"Section 1. That no disposition of property heretofore or hereafter made for any religious or charitable use shall fail for want of a trustee, or by reason of the objects ceasing, or depending upon the discretion of a last trustee, or being given in perpetuity, or in excess of the annual value limited by law; but it shall be the duty of any court having equity jurisdiction in the proper county to supply a trustee, and by its decrees to carry into effect the intent of the donor or testator, so far as the same can be ascertained and carried into effect consistently with law or equity, subject to an appeal as in other cases in said courts, respectively, and to be reviewed, reversed, affirmed or modified by the Supreme Court of this State: Provided, however, that the provisions of this act shall not apply to causes now in litigation."

And an Act of May 23, 1895, P. L. 114, entitled an amendment of section 10 of the Act of 1855, which is as follows:

"That no disposition of property heretofore or hereafter made for any religious, charitable, literary or scientific use shall fail for want of a trustee, or by reason of the objects being indefinite, uncertain or ceasing, or depending upon the discretion of a last trustee, or being given in perpetuity or in excess of the annual value hereinbefore limited, but it shall be the duty of any Orphans' Court, or court having equity jurisdiction in the proper county, to supply a trustee, and by its decrees to carry into effect the intent of the donor or testator, so far as the same can be ascertained and carried into effect consistently with law or equity; for which purpose the proceedings shall be instituted by leave of the Attorney-General of the Commonwealth, on the relation of any institution, association, corporation not for profit or individual desirous of carrying such disposition into effect and willing to become responsible for the costs thereof, subject to an appeal as in other cases in said courts

respectively, and to be reviewed, reversed, affirmed or modified by the Supreme Court of this State; but if the objects of the trust be not ascertainable, or have ceased to exist, or such disposition be in excess of the annual value permitted by law, or in perpetuity, such disposition, so far as exceeding the power of the courts to determine the same by the rules of law or equity, shall be taken to have been made subject to be further regulated and disposed of by the Legislature of this Commonwealth, in manner as nearly in conformity with the intent of the donor or testator and the rules of law against perpetuities as practicable, or otherwise to accrue to the public treasury for the public use: Provided, that this act, as amended, shall not apply to any case which has been adjudicated prior to the adoption of this amendment."

And the Act of June 1, 1915, P. L. 701, entitled:

"Relating to the acquisition and holding of property, real and personal, by any literary, scientific, educational, religious, charitable, benevolent or beneficial society, church, congregation, association, or body incorporated, or any trustee or trustees of any trust for charitable or benevolent objects or purposes; fixing the amount of such property which may thus be acquired and held; and providing for the increase of such amount, and a method of procedure for obtaining the right to such increase,"

section 2 of which raises the amount which may be held for such uses to the clear yearly value of $50,000, and providing an alternative method of proceeding in the Court of Common Pleas.

It should be noted that under the foregoing acts these trustees are only authorized to take and hold for a charitable purpose such a sum as will produce $50,000 yearly, roughly speaking $1,000,000; they may be authorized to hold a larger sum upon showing, after notice to the Attorney-General, that such larger sum can be efficiently employed for the benefit of the community. Unless this can be shown, this court is directed to award the income from the excess capital sum, *cy pres;* and this should be done, if possible, so as to preserve the main testamentary intent, omitting, it may be, administrative details. This is the first question for adjudication.

The second question relates to the disposition of the accumulated income, amounting now to about $2,000,000. May it be added to the principal as prayed for in the petition for distribution; may it be awarded *cy pres,* or must it be held to be disposed of as the legislature shall direct?

The charitable purpose of this testator is well described in his own language in clause 23 of the will, as follows: "My intention being to provide free education and maintenance for white fatherless girls . . ."

Had he stopped with this description and directed his trustees to exercise their discretion as to the means and methods to be employed, he would have shown more wisdom. He has, however, greatly hampered his purpose by setting up machinery of administration, as will be seen by the provisions of the will and codicil, which will be found in clause 23 of the will and the third and sixth clauses of the codicil, and which are as follows:

*Clause 23 of will:* "I hereby give, devise and bequeath all the rest, residue and remainder of my estate . . . In Trust, for the purpose of establishing in the City and County of Philadelphia, Pennsylvania, or one of the Pennsylvania Counties of Delaware, Chester, Montgomery or Bucks, and in the latter event as near the Philadelphia County line as may be, with due regard to land prices, a school for the purpose of educating and maintaining white fatherless girls who shall not be at the time of their admission to said school over thirteen years of age, until they shall arrive at the age of seventeen years, under the condition that such school shall be non-sectarian and that the admission of

students therein shall be limited to white girls who at the time of their admission are *bona fide* residents of the City and County of Philadelphia or of the particular County of those above named in which the said institution or school shall be located. And I direct that the said Trustees and the survivor of them shall appoint a Board of Educators, composed of the Superintendent of the Public Schools of the City of Philadelphia, three Principals of the Public Schools in the City of Philadelphia and the Superintendent of the Public Schools of the other county in which said institution shall be located, if beyond the City and County of Philadelphia, from time to time, or if any of them should decline or not serve, then in the place of such declining and not serving some other competent educator or educators to the same number from time to time (with power in said Trustees and the survivor of them from time to time of substitution and removal in said board), who or a majority of whom shall be authorized to formulate, establish and change from time to time such rules of admission and conduct of the said institution as may be required for the proper government and maintenance thereof and for the admission of students thereto and to act as visitors thereto, subject to the approval of the said Trustees and the survivor. And I hereby authorize the said Trustees and the survivor to purchase in the first place, out of the income of my estate which shall not be required to make the payments hereinbefore provided for, and when the same shall accumulate to the sum of one hundred thousand dollars ($100,000) such real estate as shall be necessary for the purpose of establishing said institution in trust for the purpose of carrying out this purpose, and thereafter out of the residue of my estate and that coming from my father or so much thereof as may be necessary from time to time to erect such improvements thereon as may be necessary for the purpose of carrying out the same and properly furnish and equip the same thereout or out of income. My intention being to provide free education and maintenance for white fatherless girls and to provide a gift to each girl on leaving the institution and upon reaching her seventeenth year, if her conduct has been satisfactory to the principal, of fifty dollars, which I hereby authorize. I enjoin upon the said Trustees and the survivor that the expenditure for maintenance shall at no time exceed the amount of the income applicable to this purpose; also that so much income as is not needed to purchase a location and to maintain said institution as possible shall be invested from time to time and added to capital to enlarge the capital of the fund and thereby to enlarge said institution from time to time and increase its usefulness in the discretion of said Trustees and the survivor of them. And I declare that this institution shall be purely a public charity and that no one except the officers and employees thereof, and the said Trustees, as such shall receive any compensation whatever for their services over expenses (the necessary expenses of said board of educators included) and the institution shall not be begun until at least the said accrued income of one hundred thousand dollars as above provided shall become available for the purpose of purchasing the necessary location. The said school or institution shall be known as the 'Charles E. Ellis College for the Education of Fatherless Girls,' and though the same shall be conducted upon non-sectarian principles I direct that the reading and study of the King James First English Bible or any revision which may take its place, and brief lectures thereon by officers or teachers shall be part of the daily instruction in the said institution in all classes."

*Clause third of codicil.* "In selecting the site for the college, I desire preference shall be given to the County of Philadelphia in a suitable location convenient of access and near a trolley or steam road. Should the Trustees deem

it most advantageous to go beyond the lines of said County, then they may do so having due regard to convenience of access and securing ground which will not be too much intersected by highways.

"In the selection of the students from Philadelphia County to be educated therein a *bona fide* residence for such period as the Trustees may determine by the regulations of said College shall be sufficient qualification for admission, but it is my wish that preference shall be given to applicants who were born in said County. Believing that for a long period applicants from the County of Philadelphia will provide for the full capacity of the College, it is my wish that no student shall be admitted from the other Counties named in my Will until in the opinion of the Trustees, or the survivor of them, vacancies can be supplied from the said Counties. The admission of students from said Counties shall be made under regulations prescribed by the Trustees, preference being given to applicants from the County where the College is located, if the cite selected should not be in Philadelphia County."

*Clause sixth of codicil.* "It is my intention by the directions given in my Will to vest in the Trustees full power, authority and discretion in the management and government of the College therein provided for. All acts and regulations which may be needful to carry out the purposes of such an institution I leave entirely to their discretion, subject only to such directions as I have given in my said Will.

"The Board of Educators to be appointed by the Trustees shall in all things act in co-operation with and subject to the approval of the said Trustees. It may be deemed expedient by my Trustees to select a Woman's Board or Committee to act in conjunction with the Board of Educators in visiting the College and making recommendations which may promote the comfort of the students and the usefulness of the College, and I hereby vest such power in the said Trustees and also the power to name such other Boards or Committees which they may deem necessary from time to time to aid them in more effectively carrying out the charitable purposes intended by me."

With these provisions of the will before me, I will first inquire as to rules of law which have been enacted by this Commonwealth and to which all perpetual trusts for charitable uses must conform. I have already recited the acts; and now to their interpretation.

Gifts for charitable uses are older than the common law. While many have been beneficial, some, at least, have proved otherwise. Hobhouse, on "The Dead Hand," says, on page 9, speaking of the conditions in England: "But there are hundreds and thousands of other foundations which, in my judgment at least, are pauperizing or degrading all those who come into contact with them."

Indefinite accumulations also gave trouble in England at an early date, and the case of Thellusson v. Woodford, 4 Vesey, 227; 11 Vesey, 112, led to the famous Thellusson Act of 39 and 40 George III, ch. 98 (1800), regulating them.

In Pennsylvania the need for regulating accumulations was voiced by Chief Justice Gibson in Hillyard v. Miller, 10 Pa. 326, wherein he said:

"Trusts for the accumulation of income are as rigidly restricted by the rule against perpetuities as legal estates. In the Duke of Norfolk v. Howard, 1 Vern. 164, Lord Keeper Guilford said: 'All men are desirous to continue their estates in their families; and if they could come nearer to a perpetuity in equity than the rules of law would admit, they would settle their estates by way of trust, which might benefit the court, but would be destructive of the Commonwealth. . . .'

"But a trust for perpetual accumulation of a part of the income, though a consequence not intended, and though the founding of a charity were the exclusive motive, would be a perpetuity productive of all the evils which the law abhors, for it would ultimately draw into its vortex all the property in the State. . . .

"The consequence of this compounding of capital would be the gradual absorption of nearly all the property in the country, which would thenceforth be locked up—a consequence more prejudicial to the general weal than that which followed the trusts in Mr. Thellusson's will, which produced little inconvenience, except to the persons ultimately entitled, though they were left to expire by their own limitation. The records of judicial decisions afford no case of a trust for perpetual accumulation without other aim—for no sane man would be so silly as to meditate such a thing; but when a trust is declared which is effectively such, though the object were ever so meritorious, ought it to be tolerated? . . . This course of the English judges is a proof of the unmitigated evil of such trusts, in the mildest cases, and a legitimate encouragement to us to pursue it here, so far as we may consistently with precedent. Had the statute not been enacted, there is little doubt that they would have put testamentary charities under wholesome restraints of their own authority, at least so far as to deprive them of their most pernicious qualities. We mean not to say that trusts for perpetual accumulation would produce in practice the extreme consequence attributable to them in theory; for the inconvenience of them would be too insufferable to allow them to be carried out; but the contingent good of any charity attached to them would not compensate the actual evil attendant on them."

From the foregoing, I conclude the Acts of 1855, etc., above quoted, are remedial in character and should be interpreted accordingly. The Act of 1855 is entitled—"Relating to . . . estates for . . . charitable uses."

The corporate trustee submits that these acts do not apply to it because, it contends, it is not an unincorporated charitable society or association. The Oxford Dictionary defines society as "A number of persons associated together, by some common interest or purpose," and association as "A body of persons who have combined to execute a common purpose; . . . the whole organization they form to effect their purpose. . . ."

While I have no doubt that the language is broad enough to include this college set up by the corporate trustee, the title and other clauses in the act are sufficient to put down any doubts. The title embraces all estates for charitable uses. Section 4 forbids the holding by "trustees, or otherwise," property greater than allowed by law; section 9 directs the escheat of property held contrary to the "intent" of the act; section 10 speaks of a "disposition of property hereafter made for a charitable use;" and section 15 provides that "All dispositions of property for charitable use . . . shall be under this act, which shall be deemed to have been made and formed under and in subordination to all the duties and requisitions of this act, as rules of property and laws for their government." Furthermore, this act has so often been applied to testamentary trusts that the question may not be regarded as an open one. See Mann *v.* Mullin, 84 Pa. 297; Frazier *v.* St. Luke's Church, 147 Pa. 256; Hunter's Estate, 279 Pa. 349; and in Stevens's Estate, 200 Pa. 318, not only was the act applied to a testamentary trust, but the very procedure herein followed for intervention with the leave of the Attorney-General was upheld.

The title of the Act of May 9, 1889, *supra*, is "Relating to estates held for . . . charitable uses;" and section 1 speaks of "dispositions of property made for a charitable use;" and the Act of May 23, 1895, *supra*, also makes use of

this expression. In Kortright's Estate, 237 Pa. 143-149, a narrow construction of this act was refused.

Sections 4 and 8 of the Act of 1855, *supra*, forbid the holding of a sum greater than the clear annual value of $5000; the Act of April 22, 1889, *supra*, raises this amount to $30,000; and the Act of 1915 fixes the limit at the clear annual value of $50,000.

Sections 9 and 10 provide for alternative methods of disposing of the surplus *corpus* so held. Section 9 provides for an escheat and section 10 for a disposition *cy pres*, if that be possible. The latter provides that "no disposition of property . . . for any . . . charitable . . . use shall fail for . . . being . . . in excess of the annual value hereinbefore limited, but it shall be the duty of any Orphans' Court, . . . by its decrees, to carry into effect the intent of the . . . testator, so far as the same can be . . . carried into effect consistently with law or equity; . . . but if . . . such disposition be in excess of the annual value permitted by law, . . . such disposition, so far as exceeding the power of the courts to determine the same by rules of law and equity," shall be disposed of by the legislature, &c.

This section specifically authorizes the Orphans' Court to carry out the intent of the testator by rules of equity. Thus, the real purpose of the testator may be preserved and the administrative machinery set up by him moulded so as to effectuate the main charitable intent. This is nothing more or less than the rule of equity known as the *cy pres* doctrine.

To substantially the same effect are the Acts of May 9, 1889, and of April 26, 1895 *(sic)*, *supra*.

The interpretation of section 12 of the Act of April 26, 1855, *supra*, presents some difficulties. Stripped of verbiage, it provides: "That, to avert the evil of an indefinite increase of the property in mortmain and perpetuity, it shall not be lawful for any . . . charitable . . . society, association or corporation, . . . to accumulate income into capital or invested estate, so as that the clear annual value thereof, . . . with those now held, shall exceed the limitation hereinbefore contained, . . . but all such clear income shall be expended annually in and for the purposes . . . for which the property producing it is held; and if there be not objects within the intent of such purposes . . . sufficient to exhaust such income, it shall be the duty of such body or association . . . to apply to the legislature for authority to expend the income . . . upon such practical objects as shall most nearly conform to the intent of the . . . trusts upon which such property is held. . . ."

This section forbids any accumulation beyond the point which will add sufficient to the *corpus* to produce net $50,000 yearly; then all income must be expended annually. But the *corpus* of this trust was already producing several times fifty thousand yearly, hence all accumulation herein is forbidden. The act provides that the surplus must be expended annually, but this was not done, and we have for disposition this huge surplus income.

The income could have been expended annually, *cy pres*, under the clause, "If there be not objects within the intent of such purposes . . ." and as there are objects within the main intent of the charitable trust, it should not be necessary to go to the legislature.

The provision prohibiting the accumulation of income has been disregarded. The petition for distribution prays that this accumulation be added to the *corpus* of the estate. Manifestly, this may not be done. The brief of counsel for the trustee suggests it could be used for additional buildings, but he overlooks the fact that this would be doing the thing which is forbidden, *i. e.*, adding it to the *corpus* in the form of realty instead of personalty. I had grave

doubts as to whether I could direct the expenditure of this accumulation *cy pres*, or was required to direct the trustee to apply to the legislature for relief. I have reached the conclusion, however, that the purpose of the Act of 1855 was to preserve the excess income to the charitable purpose, and as the main intent of the testator can be preserved under a *cy pres* plan, it will be so awarded.

This charitable disposition of nearly $4,000,000 *corpus*, being, in the language of section 10 of the Act of 1855, "in excess of the annual value permitted by law," the excess shall be disposed of by a chancellor according to equitable principles, and, failing in this, then to be held for disposition by the legislature.

Section 10 of the Act of 1855 seeks to preserve charitable gifts in excess of the amount limited, and directs the court to award it in accordance with equitable principles. This casts upon the court the duty of ascertaining, with the co-operation of the Attorney-General, whether it will be beneficial to the Commonwealth to have the excess held for institutional support of fatherless girls, or, preserving the main charitable intent of the testator, have it applied *cy pres*, and the plan suggested is for home care and education of such girls.

This Commonwealth has set up this effective device to prevent huge sums being unwisely tied up in perpetual trusts which may not serve efficiently the community. Every testator making a gift to a charitable purpose is presumed to know that section 15 of the Act of 1855 provides that "it shall be taken to have been made and formed under and in subordination to all the duties and requisitions of this act as rules of property and laws for their government."

The Commonwealth is interested in preventing what is known in England as the "dead hand" from tying up in perpetuity excess funds which do not efficiently serve the community; and for the additional reason that such property is exempted from taxation.

I must now examine the testimony and determine whether the excess *corpus*, that is, the excess beyond what is needed to raise $50,000 net, shall be held for institutional care or applied, *cy pres*, for home care of fatherless girls. It should be noted, at the outset, that the will does not forbid "home care" for such girls.

After the testator's death in 1909, several years elapsed before anything was done to put the trust into execution. If the trustees paused till they could get their bearings on the great task before them and be sure of getting a proper start, they did a wise thing. In 1907, Robert N. Carson had died, leaving about three and a half millions also for the maintenance and education of orphan girls, and his trustees were also feeling their way before attempting to plan an institution. With a view of getting the best technical thought on the problem before them, these two trustees convened, in October, 1915, in co-operation with the Russell Sage Foundation, what is now known as the Carson-Ellis Conference. This meeting was attended by representative people, including the Commissioner of Education of the United States, the Governor of Pennsylvania, the Chief of the National Children's Bureau, Secretary of the State Board of Public Charities, the Associate Superintendent of Schools of Philadelphia and representative educators from Massachusetts, New York and New Jersey.

The results of this conference were printed by the trustees and are contained in a volume of 237 pages. The trustees were urged to take legal advice as to the best course to pursue, because, it was pointed out, these immense funds could not be employed to advantage under the machinery set up in these

wills, which tend to defeat the main charitable intent and make it exceedingly difficult to obtain the numbers of girls necessary to carry out a practical scheme of education. See page 7, Carson-Ellis Conference Report.

This trustee after the conference did not seek the advice of counsel as to what course should be pursued, and no reason is offered for this omission. They rented a house in Chestnut Hill and started with a few girls, and in 1920 bought a farm at Newtown Square and erected four buildings. The testator has been dead about sixteen years, the results of the trust, to date, are: Twenty-three girls have reached the age of seventeen and been sent forth; sixty girls are now in the college, and there are $2,000,000 of accumulated income. The only excuse offered for the negligible number of girls cared for is that building costs have been too high, and while this was true for a while, nevertheless, if they had resumed building, it appears the next step was the construction of an administration building at an expense of two or three hundred thousand dollars, and then a home for the president of the college. These would not have increased the clientele. Meanwhile, the accumulation of income would have continued in spite of the prohibition of the Act of 1855.

I requested the help of the various child saving societies in this neighborhood, and they appeared by their attorneys and offered many witnesses whose testimony has been very helpful. None of these witnesses, among them some of the most expert in their spheres, were compensated. It seemed desirable to have certain detailed information respecting the college, its students and the so-called "waiting" list, and Miss Harris, a skilled social worker, was employed to secure the same. It required several months' effort and I shall make an allowance to cover the cost of her employment.

The testimony taken is voluminous and the following witnesses were examined:

[About fifty witnesses were examined, many of whom were distinguished in social and philanthropic work.]

From the testimony I conclude the need for institutional care of white fatherless girls is slight. Those who have not investigated the question have an impression that there is a wide and unsatisfied demand by such girls for admission to such an institution. The testator was under this impression when he said in the third codicil: "Believing that for a long period applicants from the County of Philadelphia will provide for the full capacity of the college, it is my wish that no student shall be admitted from the other counties named in my will. . . ."

The problem involves the upbringing of white fatherless girls. Every one knows the greatest asset a girl has in life is her mother, and next to her own mother a foster mother. This is so universally recognized to-day that nearly all groups in the community are striving to keep the orphan girls and their mothers together, thus preserving the home. This is true of the child-saving organizations, of Gentile, Jew and Catholic, of the Masons and other fraternal organizations. The great demand to-day is for support and maintenance in their own homes with their mothers or other near relative. There are a few girls for whom home care, for one reason or another, is impossible. Such girls are mentally or physically abnormal and require special medical or psychiatric treatment in an institution which specializes in such work. The situation is similar to that of a hospital. Some girls need to go to a hospital for special care, but the normal girl requires normal life at home or in a proper foster home.

The clientele for such institutional care as Ellis College is prepared to give is very greatly circumscribed. It is affected by many considerations, some of

which are: (1) The restrictions in the will. (2) Economic and social factors. (3) Public policy of the Commonwealth. (4) Other agencies. (5) Numerical extent. (6) Home care. (7) Publicity. (8) Widely diffused public education.

*(1) The restrictions in the will.*

The clientele must be white fatherless girls under thirteen years of age, and until March, 1926, the rules of the trustees required them to be poor and without relatives able to maintain and educate them, physically sound and free from disease and of good moral character, born or resident in Philadelphia or one of the adjoining counties.

*(2) Clientele as affected by economic and social factors.*

The testimony of Dr. Deardorff and Dr. Rubinow was illuminating in regard to orphange, or what makes an orphan and why an orphan comes into existence. The death of the father is the first factor. Then there is the birth rate in Philadelphia falling from 29.83 per thousand population in 1860 to 21.23 in 1923, a fall of 8.67 in the birth rate since 1860. Families are smaller and there are fewer children per thousand population. Then, too, there is the falling death rate. In 1900 the death rate in Philadelphia was 19.83 or nearly twenty persons per thousand in population die; in 1923 the rate was only 13.86 persons per thousand.

The testimony as to the increasing span of life was also in point. In 1865 the expectation of white males at the age of ten was forty years; this was increased to fifty-one years in 1910 and to fifty-five years in 1920. These figures are for selected areas and groups, but they show the great trend in the direction noted.

The modern methods of hygiene, and for safeguarding injury and death, and the restriction of immigration, all point to rapidly decreasing orphanage.

Other factors tending to reduce the clientele are the growing economic independence of women, their greater earning capacity, together with the greater diffusion of life insurance, all of which enable the widowed mother to keep her family together and save her from separation from her daughters.

*(3) Clientele as affected by public policy of this Commonwealth.*

In enacting the legislation for the Mothers' Assistance Fund, 1913, it has been the policy of this Commonwealth to keep the widowed mother and her family together, and the home has been further safeguarded by the workmen's compensation legislation enacted in 1915.

The Act of June 7, 1923, P. L. 498, known as the Administration Code, sections 2002 *(c)* and 2003, gives the Department of Welfare supervision over all children's institutions, public and private. In pursuance of this authority, the State Department of Welfare made an investigation of the policy of Ellis College, and on April 17, 1924, Dr. Potter, the head of this department, wrote Mr. Morgan, president of the trustee corporation, protesting against the acceptance of girls for whom other provision was possible. Upon this point Dr. Potter wrote:

"We do feel it necessary, however, to sound a note of warning as to your admission routine, for it is obvious that foundations such as Ellis, Carson and Girard have a very real responsibility in accepting applicants. No matter how frequent the girls' contacts with their families are or what education advantages the college has to offer above those of the girls' own homes, an institution cannot supply those subtler needs of childhood which are met in the child's own home, simple though it may be. For this reason, we would urge the use of every resource for keeping families together—relatives' interest, mothers' assistance funds, societies for organizing charity and church

support—and that you undertake the care of only those girls for whom no other provision is possible."

Thus, we see that by the two acts above alluded to, coupled with this note of warning from the State Department of Welfare, it is very definitely the policy of this Commonwealth to keep dependent children and their widowed mothers together.

*(4) Clientele as affected by other agencies.*

The testimony of Dr. Potter, Dr. Deardorff and other witnesses indicates a host of institutions for caring for white fatherless girls. There are seventy-one such institutions in the neighborhood of Philadelphia, and 202 throughout the State, and there are 2000 vacancies available for such girls, and of these 948 are in the neighborhood of Philadelphia. The religious and fraternal organizations also have institutions for such girls.

With all these overlapping, uncoördinated and unsystematic efforts for girls, Mr. Prentice Murphy testified some families of three and four children are being supported in institutions at an expense of $5000 or $6000 a year, and apart from their mothers, who for a much less sum could provide a normal home life.

*(5) Numerical extent of clientele.*

It was shown that there is a yearly average of 4200 children in Philadelphia requiring aid, and this includes the colored and unfit, and of these but 40 per cent. are girls, and but a part of these are fatherless.

The Children's Aid Society in fourteen years cared for 6965 children in several counties; of these only 664 were fatherless girls, and of this number 133 were colored, leaving 531 white fatherless girls, and of these, only 177 were under thirteen years of age, as set by the will.

*(6) Clientele as affected by home care agencies.*

The provision for home care for such girls is expanding in this community. The Jewish Federation is spending for this type of work $200,000 annually, and the Family Society, formerly the Society for Organizing Charity, $180,000. Practically all child agencies, Catholic, Jew, Gentile, Masonic and kindred groups are stressing home care and putting no girls into institutions when this is possible. The will does not prohibit this method of administration.

*(6) Publicity as affecting clientele.*

The vague idea that there are great numbers demanding this kind of care is erroneous. The experience of the John Edgar Thomson School for fatherless daughters of railroad men emphasizes this fact. This trust was before me several years ago, and after twenty years of operation they had then less than fifty girls and $800,000 of accumulated income. For six months they advertised among the whole body of railroad men in the United States and secured only about half a dozen girls. They then tried home care, with the result that they have filled up their clientele.

The demand is for home care. There are hundreds of children on the waiting list of the Mothers' Assistance Fund in Philadelphia, and it is estimated 40 per cent. of these are girls. The mothers of these girls, who are struggling to do the best for their daughters by home care, will receive the encouragement due them when the home-care plan is inaugurated.

The efforts of Ellis College to get children and their method of approach may be found in the testimony of Miss Wetherill, pages 51 to 55; Miss Cavin, pages 225 to 229 and 245 to 247, and Mr. Murphy, on page 565.

The size of the child problem is shown by the expenditure in 1923 of $4,000,-000 by private child-caring agencies, and through the Philadelphia Municipal Court of $815,000.

*(8) Clientele for education.*

In this day of splendid widely diffused public education, there can be no need of duplicating such facilities; and an efficient school with all the grades cannot be set up for a handful of children. This college now sends daily not quite one-half of the girls in the institution to the public and other schools in Philadelphia.

It is impossible to read the testimony taken before me without coming to the conclusion that the clientele needing institutional care is negligible. The trustees submitted several so-called waiting lists of girls applying for admission. These lists were in some confusion. The *amicus curiæ* had them investigated by a Miss Harris, an expert social worker, who analyzed these lists and testified at great length as to her efforts (pages 664 to 690, and 708 to 728) and summarized the results as follows:

"Q. In other words, 139 applications altogether?

"A. Yes.

"Q. You analyzed them along the following lines:

"A. Not fatherless, two; second, non-residents, fourteen; over thirteen years of age, eight; physically unfit, two; mentally retarded, two; applications withdrawn, twenty-seven; in other institutions, twenty-six; care of other agencies, six; Mothers' Assistance Fund cases, ten; should remain at home, twenty-seven; require foster care, eight; deceased, one; not found, four; admitted to Ellis College, one; too young to classify, one."

Miss Wetherill, the secretary of the college, was recalled to rebut this testimony, but her so-called waiting lists are in such confusion that it is difficult to determine their status. She was sure of fifty-four girls because their mothers had signed forms for admission, but she did not show they were eligible, or whether they were now in other institutions or on the Mothers' Assistance Fund.

It should be pointed out that there is a vast difference between those needing institutional care and those needing home care. In the former class would come the abnormal, deficient, defective, incorrigible, etc., while the latter would comprise the normal fatherless girls. Ellis College is not equipped for the former, and under our public policy the latter should have home care.

The trustees contend that they must and are administering this trust in strict conformity with the terms of the will. The actual administration does not bear this out. The will provides for a Woman's Committee to be appointed by the trustees with authority to inspect the school and suggest plans and methods. This committee has been allowed to disintegrate because it is claimed they have no power to direct. A girls' institution needs peculiarly the intelligent interest of a board of women, especially when the trustees are all men. The Secretary of Welfare for the Commonwealth has criticised these trustees for the lack of a woman's hand in the management.

The will provides for the appointment by the trustees of a board of educators. This, too, has been allowed to disintegrate and it rarely functions. As an illustration of the trustee's conception of its functioning, I direct attention to the new rules of admission which were adopted by the trustee and later submitted to the Board of Educators for approval, although the will authorizes this board to formulate and establish rules of admission.

Furthermore, in sending almost one-half of the children, daily, to the schools in Philadelphia, the trustees are doing something totally unauthorized by the will. It may be conceded that this is a desirable way in which to conduct the institution, but that is not the question.

The trustees have really set up a *cy pres* plan of their own, without the approval of the Attorney-General or a chancellor; they may not object if the Commonwealth demands the right to be heard in reference thereto.

If the trustees are right in their contention that the Act of 1855, *infra,* does not apply to them, then there is nothing to prevent their accumulating out of income fifty or even a hundred millions of dollars.

The trustees urge that this is not the time to go into these matters. This court may exercise its visitorial powers at any time, and what time is more appropriate than in connection with the audit of the trustee's account?

In the estate of Richard Smith, No. 334, October Term, 1895, the *cy pres* doctrine was applied in connection with a trustee's account; and when the fund was awarded on the executor's account to the trustees, Judge Penrose pointed out that if the Park Commission did not give its assent to the erection of the memorial arch and play-house, a plan, *cy pres*, could be invoked later: Richard Smith Estate, 181 Pa. 109. A similar situation arose in Kortright's Estate, No. 2, 237 Pa. 143; and in Stevens's Estate, 200 Pa. 318, and in Hunter's Estate, 279 Pa. 349, the *cy pres* doctrine was applied on a trustee accounting, and a moment's reflection will show there could be no objection to such practice.

I have reached the conclusion that this estate held for a charitable use is within the purview of the Act of April 26, 1855, P. L. 328, and other acts above quoted, and is subject to all the provisions thereof; that the clientele of white fatherless girls needing institutional care is so small that the income produced by the *corpus* in excess of $50,000 a year net should be applied *cy pres;* so, however, as to maintain the main charitable intent of the testator, *i. e.,* the maintenance and education of white fatherless girls; that the accumulated income should also be applied, *cy pres,* in the same manner; and that the *cy pres* plan to be adopted shall be what is known as the home-care plan, such as is followed by the Mothers' Assistance Fund and by the John Edgar Thomson School. The accountants are directed, within three months after this adjudication becomes absolute, to submit to me a detailed plan to carry into effect the directions hereof, which plan, when approved by me, will be annexed hereto and become part hereof.

A number of exceptions were granted to the accountant in the admission of testimony; they are all grounded on two questions of law, *i. e.,* this trust is not subject to the Act of 1855, and this court has no visitorial powers. I have dealt with both questions in the earlier part of this adjudication.

The accountant in making the accumulations herein shown has done so in the face of the prohibition of the Act of 1855, and in order that there might be a deterrent to similar accumulations in the future, I at first thought I should strike out one-half of the commissions for which credit is taken in this account and the supplement thereto. In view, however, of the novelty of the questions involved, I have concluded that I should not do so, as other trustees will have had their warning.

The compensation of the *amicus curiæ* and of his counsel is reserved until the termination of this litigation, when it will be fixed and awarded on petition after notice to the trustee.

The claim of Ella F. Harris for $1000 compensation for the special investigation made for the *amicus curiæ* is allowed and directed to be paid.

The claim of the official court stenographer for $224.50 for copy of the testimony furnished for the use of the *amicus curiæ* is allowed and directed to be paid.

Ellis's Estate.

This fund is also held to assure the annuities of $15,000 and $6000 to the widow and daughter of the testator; these net sums will be first paid from the income, then the net sum yearly of $50,000 for institutional care as denominated in the will, and the balance of the income will be expended *cy pres*, as herein directed, for the main charitable intent of the testator.

A claim was presented to the accountant by F. W. Van Loon in the sum of $5840 for "additional work done at Ellis College," which the accountant considered a proper claim and which, with my approval, it has paid in full.

The account and its supplement show a balance of principal of $3,922,388.19, which, composed as indicated in the account, is awarded to the accountant in trust, in accordance with the provisions of the will and of this adjudication.

The account and its supplement show a balance of income of $2,040,143.05, of which $1000 is awarded to Ella F. Harris for services, as above; the bill of the official stenographer in the sum of $224.50 is directed to be paid, as above; the amount due on the annuities to Annie E. Ellis and Ella Staley of $15,000 and $6000, respectively, is awarded to these annuitants; and the balance, together with all additional income or interest on deposits to date of payment, is awarded in accordance with the provisions of this adjudication as above fully set forth.

Counsel will prepare a schedule of distribution in duplicate and certify to its correctness and conformity herewith, which, when approved by me, will be attached hereto and made part hereof.

The certificate of the official examiner as to his examination of the securities composing the fund awarded to the account in trust will be submitted to me and subsequently hereto attached.

And now, June 17, 1926, the account is confirmed *nisi*.

Exceptions to the above adjudication were taken by the trustee.

*Owen J. Roberts (Mercer B. Tate, Jr., Ulric J. Mengert* and *I. Hazleton Mirkil* with him), for Commonwealth Title Insurance and Trust Company, trustee, exceptant.

*John S. Bradway, amicus curiæ; Jerome J. Rothschild (Fox & Rothschild* with him), for *amicus curiæ,* contra.

PER CURIAM, April 1, 1927.—As a majority of the court are of opinion that the Act of April 26, 1855, P. L. 328, and the amendments and supplements thereto, apply to the instant trust, in view of this fact, the adjudication is recommitted to the Auditing Judge (he assenting) in order that the trustee may have further opportunity of being heard as to what disposition should be made of the *corpus* and accumulated income; and all exceptions are dismissed.

GEST and VAN DUSEN, JJ., dissenting.—The Auditing Judge held, after his discussion of the Act of April 26, 1855, P. L. 328, that the trustee under the will of Charles E. Ellis is authorized to take and hold, for the charitable purposes therein set forth, such a sum only as will produce $50,000 yearly, or, roughly speaking, $1,000,000, but that it may be authorized to hold a larger sum upon showing, after notice to the Attorney-General, that such larger sum can be efficiently employed for the benefit of the community, and, unless this can be shown, this court is directed to award the income from the excess of the capital sum *cy pres*.

The vital question in this case concerns the applicability of the Act of 1855, and other statutes, to testamentary trusts such as the present, so as to limit the annual income to be derived from the estate, so devised in trust, for the charitable purposes of the will. We do not think that they have this appli-

cation, and as the question raised by these exceptions has never been raised before during the seventy years which have elapsed since the passage of the statute, and is of vital importance, we will state the reasons for our opinion, but as briefly as we can.

The Act of April 26, 1855, P. L. 328, is entitled "An act relating to corporations and to estates held for corporate, religious and charitable uses." It is evident from a perusal of it that it is intended to provide numerous and diverse regulations; some civil, others penal or criminal; some enabling; some restrictive; some substantive in character, and others merely administrative. The act is a collection of sections upon the most diverse subjects and framed to remedy most diverse conditions, as appears from a perusal of its sections *seriatim*.

The Auditing Judge definitely holds that a testamentary trust for charitable purposes is regulated by sections 4, 8, 9, 10, 12 and 15 of the act. We are of opinion, on the contrary, that the only one of these sections that has anything to do with such a testamentary trust is section 10, and that section has not the effect ascribed to it. Section 4 in terms applies only to unincorporated literary, religious or charitable societies and church associations and congregations, and prohibits them from acquiring, either in their associate name or that of trustees, real or personal property of a greater yearly value than, if incorporated, it would be allowed to hold under the general laws. Clearly this has nothing to do with such a charity as that established by the testator in this case. The trustees referred to in this section are trustees for unincorporated associations, etc., and not trustees under a will to whom is devised property for charitable purposes. Section 8, likewise, refers only to literary, religious, charitable or beneficial societies, congregations, associations or corporations which have capacity to take and hold real and personal estate, and limits their capacity to the clear annual value of $5000 and to no greater extent, without express legislative sanction. This section, likewise, has no application whatever to testamentary trusts for charity. Section 9 is *in pari materia* with the foregoing, and provides for an escheat, where the preceding sections have been violated, of property held beyond the prescribed limit. Section 10, quoted in full in the adjudication, is the only section which refers to testamentary trusts for charities, and its clear intention with respect to them is to prevent the failure of the charity by reason of the lack of a trustee, of the objects being indefinite, uncertain, or ceasing, or depending upon the discretion of a last trustee, when the court having jurisdiction is given *cy pres* power to carry the intent of the donor or testator into effect. This section applies generally to any disposition of property, and the inclusion of the words "in excess of the annual value hereinbefore limited" must necessarily have reference to those cases in which the annual value had been before limited, and the prior sections which limit such annual value can, *reddendo singula singulis*, refer only to literary, religious or charitable societies, congregations, associations or corporations. This section, indeed, is said by Justice Paxson in Frazier *v.* St. Luke's Church, 147 Pa. 256, to be merely declaratory of the law as it had existed and been enforced in the Courts of Chancery in England for hundreds of years. At any rate, this section, so far as testamentary trusts are concerned, is distinctly enabling and not restrictive.

As other sections of this act, and other acts, are mentioned in the adjudication, a few words should be added with respect to them. Section 12, likewise, refers to the same classes of subjects, religious, charitable, literary or scientific societies, associations or corporations, and forbids the accumulations of income into capital so that the clear annual value shall exceed the limita-

Ellis's Estate.

tion "hereinbefore contained," which, as has been shown, does not apply to testamentary trusts for charity, and, even if it does, the income is to be expended *cy pres*, under the authority of the legislature. Hillyard *v.* Miller, 10 Pa. 326, cited in this connection by the Auditing Judge, should be read in the light of Philadelphia *v.* Girard, 45 Pa. 9, and it will, moreover, be observed that the provisions of the Act of April 18, 1853, § 9, P. L. 507, against accumulations do not apply to a trust for charity. The subsequent Act of April 22, 1889, P. L. 42, which, in the same phraseology, raises the limit of annual income to $30,000, has clearly no bearing on the present question. The subsequent Act of June 1, 1915, P. L. 701, which raises the limit to $50,000, is also *in pari materia*, and, in any event, having been passed since the death of Ellis in 1909, cannot affect the case. The Act of May 9, 1889, P. L. 173, was evidently, and the Act of May 23, 1895, P. L. 114, was expressly, intended to supplement or amend section 10 of the Act of 1855, and what has been said with reference to that section applies to the later statutes.

The law of Pennsylvania has always favored bequests for charitable purposes, and has often gone beyond the English chancery precedents in sustaining them. The liberal doctrine laid down by Gibson, C. J., a century ago, in Witman *v.* Lex, 17 S. & R. 88, has been consistently followed ever since. The Statute of 43 Eliz., ch. 4, for example, although never in force in Pennsylvania, has always been recognized in principle more broadly than in England, and this statute expressly enumerates, among other charitable purposes, the education and preferment of orphans.

In Vaux's Appeal, 109 Pa. 497, where the charitable trust was for the establishment of an industrial home for orphan girls, the Supreme Court said it was a broad and noble charity. To hold at this late date, over seventy years since the Act of 1855 was enacted, that a few words in one section of it limit a testamentary trust for charity to an income of $5000 a year, even though it may be increased to $50,000, is a step that we are not prepared to take unless required so to do by the decision of a higher court.

If we are correct in our construction of the acts of assembly, the foundation of the adjudication is undermined and the exceptions should be sustained without the necessity of further discussion. But, inasmuch as voluminous testimony, about 900 pages, was produced before the Auditing Judge and fully commented on by him and discussed at length in the arguments before the court *in banc*, we should make some comment on it, irrelevant as we think it is.

The adjudication of the Auditing Judge contains some strictures upon the management of the trust by the trustee, and the argument of the *amicus curiæ* contains numerous others, alleging, for example, the indifference of the managing board to suggestions to increase the usefulness of the institution, the failure of the members of the board to obtain personal knowledge of its operation and their delay in establishing the home. If the trustee has been negligent in the discharge of its fiduciary duty, the remedy is by a petition to the court, asking for its removal and the appointment of a substituted trustee, but the remedy is not the taking of the assets of the trust estate away in order to devote them to a purpose which might be thought more beneficial to the community. The Auditing Judge criticises the trustee for sending many of the children to schools in Philadelphia, yet this is one of the recommendations of the Carson-Ellis Report, which recommends this very thing to be done in order that the girls may have contacts with the outer world, while, in other respects, the trustee is criticised for not having followed other recommendations of the same report.

Ellis's Estate.

The burden of the testimony, as summarized in the adjudication, was that public "need for institutional care of white fatherless girls is slight;" that "the great demand to-day is for support and maintenance" (of children) "in their own homes with their mothers or other near relatives;" that, "in enacting the legislation for the Mothers' Assistance Fund, 1913, it has been the policy of the Commonwealth to keep the widowed mother and her family together," and, consequently, the Auditing Judge, having concluded that the acts of assembly above discussed apply to this case, further found that the income in excess of $50,000 and the accumulated income on hand should be applied *cy pres*, according to the home-care plan, such as is followed by the Mothers' Assistance Fund and by the John Edgar Thompson School, and directed the accountants to prepare and submit to him a detailed plan to carry into effect the directions of the adjudication.

In our opinion, the time is not ripe for any consideration of the application of the *cy pres* doctrine to this trust. The objects of the trust, as set forth in the will of the testator, are not indefinite or uncertain, nor have they ceased to exist. They are distinctly charitable and have by no means been shown to be impracticable. They are not contrary to public policy, but, on the contrary, were warmly approved by the Supreme Court in Vaux's Appeal, above quoted. The trust should be carried out according to the direction of the testator: Hunter's Estate, 279 Pa. 349. Impressed by the testimony of the social workers, who were called by the *amicus curiæ*, the Auditing Judge said, in his adjudication: "It should be pointed out that there is a vast difference between those needing institutional care and those needing home care. In the former class would come the abnormal, deficient, defective, incorrigible, etc., while the latter would comprise the normal fatherless girls. Ellis College is not equipped for the former, and under our public policy, the latter should have home care." According to this, there is no use for Ellis College at all, and yet, one of the most distinguished of the witnesses, Dr. Ellen C. Potter, then the Secretary of Welfare of the Commonwealth, admitted in her testimony, page 359, that there was some place for institutional work, and in her letter to Mr. Morgan, president of the trustee corporation, was highly commendatory of Ellis College, and gave it, in her classification of "points," forty-one out of a possible forty-two, her sole objection being that there was no woman on the board.

It may be that present-day social workers are of the opinion that home care is better than institutional care for children, but, even though this roughly stated proposition should be admitted to be correct, it does not follow from this that the carefully devised plan of a philanthropic testator is to be set aside and his estate diverted from the trusts of the will simply because social workers think he should have made another will. Girls may be better off at home if their home happens to be better than an institution, but it is easier to bring c ildren forth than to bring them up, and it does not follow because a woman has borne children that she is endowed with good principles, good sense and good temper that form the trinity of qualifications necessary to make that home a happy one and to afford the proper training for the children in it.

We must also dissent from the opinion of the majority of the court recommitting the adjudication to the Auditing Judge, in order that the trustee may have further opportunity of being heard concerning the disposition of the trust estate. The fundamental question of law, which should first be settled, is the applicability of the Act of 1855, and until the Supreme Court decides this question, all further testimony or discussion is premature and worse than useless.

Ellis's Estate.

We would, therefore, sustain the exceptions and award the balance shown by the account to the trustee for the uses and purposes of the will. If, in the course of time, it definitely appears that the income of the estate is more than can be used for the purposes of the will, it will be time enough to consider the question whether this court can or should deal with the excess under the doctrine of *cy pres.*